**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>JOHN QUATRATO QUADROZZI JR., a/k/a JOHN Q. QUADROZZI, JR.<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-12665 (___) |

**DECLARATION OF JOHN QUATRATO QUADROZZI JR.**
**UNDER RULE 1007-4 OF THE LOCAL BANKRUPTCY RULES FOR THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK**

I, John Quatrato Quadrozzi Jr., also known as John Q. Quadrozzi, Jr., make this declaration under 28 U.S.C. § 1746:

1. I am the debtor in this case (the "Debtor"). I am also the President and the sole stockholder of record of Gowanus Industrial Park, Inc. ("GIP"), a Delaware corporation that owns and operates the Gowanus Bay Terminal (the "Terminal"), a working marine and industrial terminal on approximately forty-five acres of upland and land under water , Lot 1 upland 515,383 square feet, underwater land 1,073,719 square feet – 1,589,102 square feet; Lot 2 the Henry St basin underwater land 388,300 square feet (, at 685–747 Columbia Street, in the Red Hook section of Brooklyn, New York. I have managed GIP and the day-to-day operation of the Terminal for more a few month short of 30 years this February 2027 . I reside at 364 Henry Street, Brooklyn, New York.

2. On the date hereof (the "Petition Date"), I commenced with this Court (the "Court") a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I am familiar with my own financial affairs, with GIP's business, operations, books and records,

[1] The last four digits of the Debtor's Social Security number are 9038. The Debtor's address is 364 Henry Street, Brooklyn, New York 11201.

and with the circumstances that led to the commencement of this case (the "Chapter 11 Case"). Except as otherwise indicated, the facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, my review of the loan documents, the lender notices and the other documents identified in this Declaration, information provided to me by GIP's personnel or by my advisors and counsel, or my opinion based upon my experience and my knowledge of GIP's operations and of the Brooklyn waterfront of which I've operated and worked for forty years.. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3. This Declaration is submitted pursuant to Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules") for the purpose of apprising the Court and parties in interest of the circumstances that led to the commencement of the Chapter 11 Case, and in support of the applications and motions that I expect to file in the first days of this case, including my application to retain counsel. GIP is not a debtor in this or any other case.

4. In summary, I commenced this case so that the Terminal can be sold at its market value in an orderly process, for the benefit of my estate and all of my creditors, rather than at the auction of my GIP stock that the holder of GIP's mortgage loan noticed on September 10, 2026 and scheduled for November 12, 2026. The Terminal is worth far more than the debt against it. The appraisal on which the loan was underwritten valued it at $109 million in March 2024, and Cushman & Wakefield's August 2026 valuation placed it between $110 million and $133 million as is, and at approximately $181 million upon lease-up, against a loan of $53.5 million. The auction would have delivered the Terminal to the lender, by credit bid, for whatever amount the lender decides to bid, potentially creating a large deficiency, and would have eliminated the equity that is the primary source of recovery for every other creditor I have. A sale process conducted by a national industrial brokerage has been under way since early October 2026; it has produced



ACTIVE 730635514v7

executed confidentiality agreements from institutional investors, site tours and a written offer, and at least six parties are actively pursuing the Terminal. This case was commenced so that the sale process can be completed and every creditor paid.

5. Section I of this Declaration describes my story with the Terminal, GIP and its business. Section II describes the loan and the lender. Section III describes the lender's auction of my stock and why it would destroy value rather than realize it. Section IV describes the sale process that is under way, the value of the Terminal and the purpose of this case. Section V describes my other creditors and the matters concerning my affairs. Section VI describes how I intend to proceed. Section VII identifies the attached schedules of information required by Local Rule 1007-4.

**I.**

**<u>The Quadrozzi Family, GIP and the Gowanus Bay Terminal</u>**

6. My Grandfather an Italian Immigrant came thru Ellis Island, was naturalized as a US Citizen, starting a business as a farrier, blacksmithing horses and fabricating formed metal ironworks and tools. My father, at a young age, was my grandfather's hammerman. As horses and wagons transitioned to trucks, they went into the junkyard business. Thereafter, my father and his brother formed Quadrozzi, expanding their repertoire to truck body build and mechanics. However, in 1964, my father and his oldest brother changed gears and co-founded Quadrozzi Concrete Corp., a ready-mix concrete manufacturing company. This is where I grew up working from the age of 10 to 24. I thereafter segued to a new venture in Sunset Park Brooklyn, importing cement and unloading full sized cargo ships providing NYC, Nassau, Suffolk, and lower Westchester, NY with the area's highest quality cement, and allowing a new scale of growth for

the companies. From there and recognizing the opportunity that sat across the Gowanus Bay from me, I pursued acquiring Gowanus Industrial Park to expand my growth. .

7. In February 1997, GIP purchased the former Gowanus Bay Terminal from the Port Authority of New York and New Jersey for $3.5 million, by deed dated February 26, 1997. The site is located on the Gowanus Bay at the southern end of Red Hook. It consists of 2 parcels, parcel 1 is approximately 12.7 acres of upland (554,930 square feet), together with piers, bulkheads, and parcel 2 is the Henry Street Basin, more than thirty acres of land under the waters of the basin and Gowanus Bay extending to the exterior bulkhead lines / property lines (collectively, the "Property"). Parcel 1 is designated Block 614, Lot 1 on the tax map of Kings County and is zoned M3-1 for heavy industrial use (the "Terminal"). It includes the Gowanus Bay Terminal Grain Elevator, a twelve-story reinforced-concrete grain elevator built by the State of New York in 1922 that is amongst the most recognizable structures on the Brooklyn waterfront. Parcel 2, the Henry St Basin, is adjacent underwater lands.

8. GIP operates the Terminal as a working marine-industrial facility. GIP licenses yard space on the upland to approximately twenty operators for the storage of buses, trucks, containers and construction equipment under month-to-month license agreements; provides dockage and berthing along its piers and bulkheads to marine operators, including a fuel-bunkering company and a bulk marine operator for sand, stone and rock salt (road de-icing salt); and from time to time licenses the site to film and television productions; as well as large scale music and arts/theatre events. Additionally, GIP hosted not-for-profit relating to waterfront matters utilizing floating vessels. Twenty-two license agreements were listed on the schedule of license agreements that GIP delivered at the 2024 loan closing. GIP itself provides access control, security, site maintenance and grounds-keeping for its licensees. GIP's license and dockage

income was approximately $190,000 er month as reflected on that schedule, and is approximately $190,000 per month today. The Terminal is one of the last privately owned working waterfront parcels of its size in Brooklyn, and it is located in a submarket in which logistics users and their landlords have paid record prices for land in recent years.

9. GIP has 100 shares of common stock issued and outstanding, all of which are registered in my name under Certificate No. 08, dated April 26, 2024 (the "Shares"). GIP's board of directors consists of me and an independent director whom GIP was required to seat as a condition of the 2024 loan, by an amendment to GIP's by-laws dated April 26, 2024. I am GIP's President and Secretary. An affiliated service company that I own, QUE LLC, provides service, marketing & development and licensee-relations support to GIP under the trade name GBX~Gowanus Bay Terminal.

10. Although always having full interest in all the Shares, I officially acquired the Shares by inheritance. After my father's death, my mother, Theresa Quadrozzi, held the stock of GIP until her own death on December 31, 2019. Under her will which I am the personal representative of my mother's estate, which is being administered in the Circuit Court for Collier County, Florida, being her domicile (File No. 11-2022-CP-002972-0001-XX), under letters of administration issued on September 7, 2023. The Shares were distributed to me from the estate, and the certificate in my name was issued, on April 26, 2024, the day the current loan closed.

11. Through three single-member limited liability companies that I own, VBX-4.16069.1, LLC, VBX-4.16069.30 LLC and Vernam Basin Terminal, LLC (the "Queens LLCs"), which are licensed to a contractor for approximately $33,000 per month. The Queens LLCs are co-borrowers on the loan described below, and the Queens Parcels are mortgaged to the Lender. I hold interests in other real estate entities, which will be identified in my Schedules.

## II.

## The Loan and the Lender

12. Since 2018, GIP has financed the Terminal through a series of short-term loans from private, non-bank lenders. From October 2018 to April 2024, the lender was Emerald Creek Capital, whose loan grew in stages from $21 million to $40 million.

13. On April 26, 2024, GIP and the Queens LLCs, as co-borrowers, refinanced the Emerald Creek debt with a loan in the principal amount of $53,500,000 (the "Loan") from Columbia Industrial Capital LLC, as administrative agent, and Columbia Industrial Capital Offshore LLC (together, the "Original Lender"), evidenced by a Consolidated, Amended and Restated Note dated as of April 26, 2024 (the "Note")." The Loan had an eighteen-month term maturing on November 1, 2025, bore interest at a floating rate of 8.00% over Term SOFR, subject to a floor, which was approximately 13.33% per annum at closing (approximately $594,000 per month), and provided for a default rate of 24% per annum and an exit fee of $267,500. Of the $53.5 million, according to the closing statement for the Loan, $40,814,473.99 repaid Emerald Creek, $9,770,000 was held back by the Original Lender as an interest reserve to fund the monthly interest payments during the term, and the balance paid the Original Lender's origination fee of $802,500, closing costs, and tax and insurance reserves of $715,000.83.

14. The Loan is secured by (a) a Modification, Consolidation, Extension and Spreader Agreement (Mortgage) dated as of April 26, 2024 (the "Mortgage"), which is a consolidated mortgage on Parcel 1 and the Queens Parcels, and an assignment of leases and rents of the same date, (b) a Pledge and Security Agreement dated as of April 26, 2024 under which I pledged the Shares (the "Pledge"), and (c) a pledge of GIP's reserve and operating accounts under an Interest, Tax and Insurance Reserve Pledge Agreement of the same date. The Loan was never intended to

be secured by Parcel 2, and the mortgage does not encumber Parcel 2, but Parcel 2 is inadvertently impacted by the Pledge, because it is owned by GIP. I also executed in favor of the Original Lender a Recourse Carveout Guaranty (the "Carveout Guaranty") and a Guaranty of Debt Service and Carry Costs (the "Carry Guaranty") and, together with GIP and the Queens LLCs, an Environmental Indemnification Agreement (the "Environmental Indemnity" and, together with the Carveout Guaranty and the Carry Guaranty, the "Guaranties"), each dated as of April 26, 2024.

15. The Loan was a bridge loan. Its term, rate and interest reserve were structured to carry the Terminal for eighteen months while GIP pursued a long-term transaction for the site, and it was sized on the value of the real estate rather than on the Terminal's income. The Original Lender's term sheet dated February 16, 2024, capped the Loan at a maximum of 55% of appraised value, and the Loan was underwritten on a restricted appraisal report of the Terminal prepared by Joseph J. Blake and Associates, Inc., dated March 20, 2024, for Heights Advisors, the mortgage advisor on the Loan, and paid for through the closing statement (the "2024 Appraisal"). The 2024 Appraisal valued Parcel 1, as land, at $109,000,000 as of March 12, 2024, by the sales comparison approach, treating the existing landside improvements as contributing nothing to value and attributing no separate value to the Terminal's operating business. The Loan was therefore made at approximately 49% of the appraised value of Parcel 1 alone, before the Queens Parcels.

16. The Note gave the borrowers the option to extend the maturity date for two consecutive three-month terms, to February 1, 2026, and then to May 1, 2026, upon satisfaction of conditions that included written notice, the absence of an Event of Default, deposits into the interest and tax-and-insurance reserve accounts sufficient to carry the Loan through the extended maturity date, an extension fee of 0.25% of the Loan, and the debt-service-coverage and loan-to-

value requirements. The transaction GIP was pursuing in 2024 had not closed, and GIP was unable to refinance the Loan on acceptable terms before November 1, 2025, so GIP exercised the first extension option. On October 28, 2025, the Original Lender issued a Conditional Confirmation of Loan Extension (the "Extension Letter"), in which it stated that it "intends this notice to serve as confirmation that Borrower has effectively exercised its first extension option," waived the debt-service-coverage and loan-to-value requirements, and confirmed that the maturity date would be extended to February 1, 2026 upon payment, on or before October 29, 2025, of an extension fee of $133,750, deposits of $607,502.40 and $102,745.45 into the interest and tax-and-insurance reserve accounts, and a reserve rebalancing payment of $27,718.45, or $871,716.30 in all, with further reserve deposits to follow on November 28 and December 28, 2025. The borrowers paid the full $871,716.30. By a Notice re Return of Funds dated October 31, 2025 (the "Return Notice"), the Original Lender acknowledged receipt of the $871,716.30 on or around October 31, 2025, stated that it had not been paid in full by October 29, 2025, and returned the funds, improperly treating the extension as not having occurred.

17. The Loan therefore allegedly matured on November 1, 2025, a fact that I dispute, and was not repaid. By a Notice of Maturity dated November 4, 2025 (the "Maturity Notice"), the Lender described below stated that the borrowers had failed to pay the Loan on the Maturity Date of November 1, 2025, that the borrowers had thirty days to cure, and that interest would accrue at the Default Rate, assertions that I dispute. By the Lender's calculation in the payoff statement described below, default interest allegedly accrues at $35,666.67 per day, approximately $1.07 million per month.

18. Two days before maturity, on October 30, 2025, the day after it issued the Extension Letter and received payment, and the day before it issued the Return Notice, the Original Lender

sold and assigned the Loan to 699 Columbia Holdings, LLC, a Delaware limited liability company (the "Lender"), and so advised the borrowers by a Notice of Assignment of Loan of the same date (the "Assignment Notice"). The Assignment Notice directed that all inquiries concerning the Loan be made to the Lender in care of Golden East Investors, LLC in Rego Park, New York, and the Maturity Notice was issued on the Lender's letterhead from the same address. Upon information and belief, the assignments of the Mortgage and of the leases and rents to the Lender were recorded in the Office of the City Register, Kings County, on November 12, 2025. The Lender acquired a loan that was about to mature, secured by a property worth far more than the debt, from a borrower with which it had never dealt.

19. The Lender's payoff statement, good through November 3, 2026 (the "Payoff Statement"), states that it is owed $67,101,232.23, consisting of $53,500,000 of principal, $27,718.45 of interest accrued through October 31, 2025, $13,125,333.36 of interest at the 24% Default Rate from November 1, 2025 through November 3, 2026, the $267,500 Exit Fee, $100,000 of estimated legal fees, and $80,680.42 of publication, auctioneer and broker charges for the Auction described below, and that default interest continues to accrue at $35,666.67 per day. I reserve all of my rights, and those of my estate and of GIP, with respect to the amount of the Lender's claim, including the allowability of default-rate interest, the exit fee, the Lender's fees and the costs of the Auction.

## III.

## The Lender's Auction of the Shares

20. The Lender has not commenced an action to foreclose the Mortgage on Parcel 1. I understand that a mortgage foreclosure in New York is a judicial proceeding in which the owner is entitled to answer and to raise its defenses, the court fixes the amount due through a referee, the property is sold at a commercially reasonable public sale after publication, and the process

could take a year or more. Those protections exist because of the magnitude of what is at stake in the foreclosure of a complex commercial property.

21. The Lender elected a different course. By a Notice of Disposition of Collateral dated September 10, 2026 (the "Sale Notice"), sent to me, to the borrowers and to my transactional counsel by overnight courier and regular mail, it gave notice that it would sell the Shares at a public auction under Article 9 of the New York Uniform Commercial Code. The Sale Notice and its Terms of Sale require prospective bidders to register, certify their eligibility and prove their funds by 3:00 p.m. on November 5, 2026, and to post a $2,000,000 deposit by 3:00 p.m. on November 9, 2026, and schedules the auction for 11:00 a.m. on Thursday, November 12, 2026, at the Manhattan offices of the Lender's counsel, Herrick, Feinstein LLP, to be conducted by a licensed auctioneer with the Lender's broker, Newmark (the "Auction"). A copy of the Sale Notice, with its Terms of Sale, is annexed hereto as Exhibit A.[2] Under the Pledge, the Lender is entitled to bid at the Auction by crediting its debt rather than paying cash.

22. The Terms of Sale annexed to the Sale Notice set the conditions of the Auction. Every bid other than the Lender's must be for cash, with a deposit of not less than 10% of the bid within two business days after the Auction and the full balance within thirty days, and without any financing contingency. Every bidder other than the Lender must certify in writing that it "has no affiliation with the Pledgor, Borrower, or Guarantor," which excludes me, GIP, my family and any investor, partner or lender that I might bring to the Auction. Access to the data room through which the Lender is furnishing information about GIP and the Property to prospective bidders requires a click-through confidentiality agreement which expressly excludes me and my representatives, so that I cannot see what the Lender is telling prospective purchasers about my

[2] Sale Notice at 1–3; Terms of Sale at 3–4.

own company and the significant real estate that it owns. The Lender reserves the right to credit bid, which the Terms of Sale state it "anticipates doing," to designate a nominee or affiliate to take title, to reject any or all bids, to accept a lower bid that it prefers, to modify the Terms of Sale at any time and to adjourn the Auction without notice, and no sale is final until the Lender accepts it in writing.[3]

23. A purchaser of the Shares acquires ownership of GIP, and GIP owns the Terminal (Parcel 1). Not only that, but a purchaser of the Shares acquires control of Parcel 2 (the Henry St. Basin), which is not subject to the Mortgage, and which was never intended to be part of the collateral package. The Auction is therefore a sale of the Terminal in all but name, and it would transfer a forty-five-acre Brooklyn waterfront property without any realistic prospect of a bidder other than the Lender.

24. The Auction will not produce a market price, for reasons unrelated to the value of the Terminal. A third-party bidder would have to value that equity within a few weeks, without the due diligence that any institutional purchaser of a waterfront industrial site requires, and would be acquiring a corporation, with its history, liabilities and tax attributes, rather than the real estate itself. To my knowledge, no prospective bidder has asked to inspect the Property, to conduct environmental testing, to review a survey or to perform any of the property-level diligence that a purchaser of a waterfront industrial site ordinarily performs; GIP controls access to the Property, and no such request has been made to it. The outcome of the Auction was therefore predetermined. The Lender, or its designee, would acquire the Shares by credit bid at whatever price it chooses, for no cash, and with them a property that the Lender's own underwriting valued at more than

[3] Sale Notice at 3–4; Terms of Sale at 1, 3–5 and Appendix 1 (Certification) ¶ (h)(i).

twice the principal of the Loan, and that Cushman & Wakefield valued this August at up to $133 million, not including underwater lands and the Henry St. Basin.

25. Had the Auction proceeded, the Lender would have captured the entire equity in the Terminal (and the Henry St. Basin) for the amount of its debt (or some amount less than the debt, since it could credit bid what it wants if there is no competitive bidding); GIP would have continued to owe the Loan, to a lender that by then owned GIP; and I would have been left with nothing except liability under the Guaranties, pursuant to which the Lender could pursue me for whatever deficiency it chooses to assert following a sale that it had conducted and at which it was the only realistic bidder. This action would have significantly impaired my estate and my other creditors, because the equity in the GIP is the most valuable asset that I own.

26. The Auction is not the only means by which the Lender seeks control of GIP. The Pledge purports to permit the Lender, after a default (specifically invoking such a right) and notice, to vote the Shares under an irrevocable proxy that I signed at the loan closing, to accept a resignation as GIP's officer and director that I was also required to sign at the closing, and to reconstitute GIP's board. These rights have not been invoked by the Lender. I understand that the commencement of this case stays the Auction and the exercise of those rights, because the Shares are property of my estate.

27. On November 6, 2026, my counsel delivered to the Lender's counsel, by email, a written objection to the Auction, demanding that the Lender adjourn it, withdraw the affiliation requirement, give me and my representatives access to the data room, permit qualified bidders affiliated with or sponsored by me to participate, allow a commercially reasonable period for property-level diligence and for the sale process described in Section IV below, and preserve its

records concerning the Auction, and asking for a response by 5 p.m. ET on November 6, 2026. The Lender did not respond.

**IV.**

**The Sale Process, the Value of the Terminal and the Purpose of this Case**

**A. The Marketing Process**

28. GIP engaged KBC Advisors ("KBC"), a national brokerage that specializes in industrial and logistics real estate and whose clients include the occupant of two of the largest logistics facilities in Red Hook, to market the Property, under a listing agreement dated September 25, 2026. KBC launched its marketing campaign on October 7, 2026.

29. The launch on October 7, 2026, consisted of an offering memorandum and an email campaign to 1,397 investor contacts, followed by further campaigns on October 13, October 21 and November 9, 2026. Within three weeks, ten investors representing thirteen companies had executed confidentiality agreements and received the offering materials; four had toured the Property; and one had submitted a written offer. As of the Petition Date, KBC has advised me that at least ten qualified institutional investors and users have expressed strong interest in the Property, that at least six of them are actively pursuing a transaction, and that tours of the Property are continuing. The identities of these parties and the terms under discussion are confidential, and I have not described them here because public disclosure would compromise the sale process; I will provide further detail to the Court, with appropriate protection for that information, if the Court requires it. The interest in the Property includes interest in the Terminal's deep-water access for the movement of freight by water, which the City of New York has made a priority under the Blue Highways Action Plan issued by the New York City Economic Development Corporation and the Department of Transportation on October 31, 2025.

30. KBC's process was designed to proceed on the schedule that a sale of this kind requires, with a marketing period, a call for offers, the selection of a purchaser, a contract with a deposit, due diligence and a closing. Nine weeks separate the Sale Notice from the Auction. A sale of this kind cannot be adequately conducted inside the Auction's structure at all.

**B. The Value of the Terminal**

31. I believe the Property is worth more than three times the principal of the Loan, especially when including the unrealized value of the underwater lands and Henry St. Basin, far more than the Lender's claim even as the Lender computes it, and I expect the evidence to confirm it. The 2024 Appraisal, on which the Loan was made, valued the Terminal alone at $109 million as of March 12, 2024, as land, against a Loan of $53.5 million and a claim the Lender now puts at $67.1 million. In August 2026, Cushman & Wakefield estimated the as-is value of the Terminal at $109.9 million to $133.4 million, assuming the site is delivered vacant and attributing no value to GIP's license income, and its value upon lease-up of the upland at approximately $181.3 million (the "C&W Valuation"). The high end of that range is almost three times the amount of the Lender's claim. The low end is $43 million above it.

32. Red Hook has become one of the most sought-after last-mile logistics locations in the United States. Upon information and belief, based on published reports of recorded transactions, the land under the logistics facility across Columbia Street from the Terminal, at 640 Columbia Street, sold for $47.5 million in 2018, roughly $273 per square foot of land, and the completed facility sold for $330 million in 2022; a publicly traded industrial real estate investment trust paid $156.25 million in December 2024 for a facility at 280 Richards Street a few blocks away, and $26.3 million in August 2026 for the former fuel terminal at 659 Court Street that adjoins the Henry Street Basin; and a package-delivery company paid $303 million in 2018 for

an assemblage of Red Hook waterfront parcels, none which include underwater lands like at GIP. Applied to the Terminal's 554,930 square feet of upland alone, those land values imply a value in excess of $100 million before any value is attributed to the piers, the basin and more than thirty acres of land underwater, which are irreplaceable for a maritime user. Sophisticated investors do not sign confidentiality agreements, tour a property and submit offers unless they believe its value exceeds the debt against it.

**C. The Purpose of this Case**

33. I did not commence this case for the purpose of delay. I commenced it because the Auction would have converted a property worth far more than the debt into the Lender's property for the amount of the debt (or some amount less than the debt, as the Lender may elect without competitive bidding), and because the automatic stay was the only means of preventing that result on the timetable the Lender had set. The purpose of this case is to complete the sale process that is already under way in a commercially reasonable manner; to sell the Terminal at its market value; to pay the Lender in full the amount it is actually owed; to pay every other creditor in full from the surplus, through a confirmed plan; and to preserve for me and my family what remains. The equity in the Terminal is sufficient to accomplish each of those objectives, and no other course would.

34. The sale process KBC is conducting is a market-standard process for the sale of an institutional-grade industrial property of this size in New York City. Based on KBC's advice and the interest the process has generated, I expect that KBC will complete its marketing of the Property within approximately thirty days after the Petition Date; that GIP will select a purchaser and sign a letter of intent within approximately thirty days after that; and that GIP and the purchaser will execute a contract of sale, with a deposit, approximately thirty to forty-five days

after the letter of intent is signed. KBC advises that a purchaser of a property of this kind customarily requires approximately forty-five days after the contract is signed to complete its due diligence, and that the closing customarily follows approximately [thirty to sixty] days after that. These are anticipated time frames; they may shift depending on the purchaser and on matters outside my control, but I believe they are realistic. I intend to file a plan and disclosure statement, funded by the sale proceeds. If the sale can be accomplished more quickly, it will be; every month of delay costs my estate more than $1 million in alleged default-rate interest, and I have every incentive to proceed as quickly as the process permits.

35. The Lender is not prejudiced by the orderly sale that this case permits. The Lender is oversecured by a wide margin, and interest continues to accrue on its claim. The Property is insured, with the Lender named as mortgagee and loss payee as the Mortgage requires. Real estate taxes and water and sewer together with insurance have been paid by GIP; charges on the Property are current, and GIP will keep the charges current during the course of this bankruptcy case. GIP will continue to operate and maintain the Terminal; will grant no lien on the Property; and will provide the Lender with monthly reporting on the Terminal's operations and on the sale process. GIP will pay taxes, water and sewer charges and insurance premiums as they come due and will give the Lender and its appraiser access to the Property on reasonable notice. The value of the Property is in the land and the waterfront, not in improvements, so it is not a wasting asset. The Lender's rights under the Loan documents at the GIP level, including its cash-management arrangements and the reserves it holds, are not affected by this case.

36. The Lender may assert that the commencement of this case itself renders me liable for the entire Loan under the Carveout Guaranty. I reserve the right to contest that assertion, but

it does not alter the course of this case. The Loan will be paid in full from the sale of the Terminal, and the Guaranties will be satisfied with it.

## V.

## My Other Creditors

37. This case is not a two-party dispute. Apart from the Lender, my creditors include the Internal Revenue Service and the New York State Department of Taxation and Finance; the City of New York and its Landmarks Preservation Commission; the New York City Environmental Control Board; the Federal National Mortgage Association, which holds the mortgage on my residence; the professionals who have represented me; the utilities that serve my residence; and other unsecured creditors. All of them will be paid in full under the plan I intend to propose.

38. There are issues I wish to disclose, each of which requires correction. Each has a remedy, and each will be addressed in this case.

### A. Tax Returns

39. I have not filed federal, New York State or New York City personal income tax returns for the tax years 2019 through 2025, although I have paid estimated taxes throughout this entire period. The Original Lender knew this when it made the Loan in 2024 and required me, as a covenant, to file the delinquent returns within 120 days after the closing; I was not able to complete the task within that time frame. Nevertheless, I have engaged  Mindy Eisenber Stark, CPA, CFE a certified public accountant (the "Accountant"), to prepare the returns. The Accountant has begun work and expects to complete and file all returns that are past due during this case. I intend to file all post-petition returns when due and pay all post-petition taxes as they come due. Upon information and belief, the New York State Department of Taxation and Finance

filed a tax warrant against me on April 29, 2026, in the amount of $20,554.95, which was paid prior to this case being filed.

**B. 364 Henry Street**

40. I own my residence at 364 Henry Street, ~~and the carriage house behind it at 129 Congress Street,~~ in the Cobble Hill Historic District of Brooklyn. The house dates from the 1863s and the carriage house from the 1860s. Two matters concerning them are pending in the Supreme Court of the State of New York, Kings County.

41. In 2010, the City of New York and the Landmarks Preservation Commission ("LPC") commenced an action against me under the Landmarks Law concerning the condition of the two buildings and work performed at the carriage house (*The City of New York and the Landmarks Preservation Commission v. John Quadrozzi Jr.*, Index No. 8442/2010 (Sup. Ct. Kings Cty.)) (the "Landmarks Action"). None of the conditions were caused by me as I purchased the 364 Henry Street property in deplorable conditions from the prior owners, which LPC never sought to correct. When I attempted to repair responsibly/correctly, my efforts were thwarted by LPC which sought their Patch & Cover means. At one point, I even had to file a cease & desist motion to stop LPC from demolishing my Landmarked building so I could proceed with my approved plans I had procured. In 2013, the City and I entered into a stipulation and order, so-ordered by the court, that resolved the City's claim for civil penalties, required me to complete specified exterior restoration work at the two buildings by dates certain, and provided that, if the work was not completed by those dates, I would pay a penalty of $150,000 plus an additional $1,000 per week of lateness until the work was complete (the "Stipulation"). By Order and Judgment dated July 2, 2026 (Levine, J.S.C.), on the City's motion for a money judgment on accrued penalties and my cross-motion to modify the Stipulation, the court found that the exterior

work had not been completed as of September 13, 2025, declined to assess penalties for thirty-six weeks that it attributed to the COVID-19 pandemic, and entered judgment against me for $214,000, representing the $1,000 weekly penalty for the period from November 28, 2020 through September 13, 2025, less those thirty-six weeks. The court also ordered that penalties accruing after September 13, 2025, be held in abeyance pending a further motion by me to modify the Stipulation, for which it set a briefing schedule and an argument date of September 29, 2026. I intend to complete the restoration and to pay the judgment, and any further penalties the court allows, under the plan.

42. In 2000, I gave a mortgage on 364 Henry Street to EAB Mortgage Company, Inc. in the original principal amount of $522,700, which is now allegedly held by the Federal National Mortgage Association ("Fannie Mae"), although I dispute, among other things, whether Fannie Mae received a valid assignment. On February 27, 2014, Fannie Mae commenced an action to foreclose that mortgage (*Federal National Mortgage Association v. Quadrozzi*, Index No. 3017/2014 (Sup. Ct. Kings Cty.)), alleging in its verified complaint a default in the installment due December 1, 2008, and an unpaid principal balance of $490,104.15. I answered on August 11, 2014, denying the material allegations, asserting affirmative defenses and asserting a counterclaim. The action has remained pending since then, and no judgment of foreclosure has been entered. Fannie Mae sought summary judgment twice, and both attempts were denied. Fannie Mae asserts that it is owed approximately $1.6 million, including interest and advances for taxes and insurance; I dispute the validity and amount of the claim.. The property is worth substantially more than Fannie Mae's claim, and that claim, if it is allowed, and in whatever amount is allowed, will be paid in full under the plan.

43. Violations issued by City agencies with respect to my residential properties, and adjudicated before the Environmental Control Board, remain outstanding. I am reconciling them, and the amounts will be scheduled and paid under the plan.

**C. The Family Will Agreement and My Mother's Estate**

44. The Family Note was payable to my four sisters, Juliana, Regina, Theresa and Catherine, in fifty-two monthly installments of $82,692.30 beginning on January 1, 2022, and matured on April 30, 2026. I paid it in full; the final installment was paid on April 1, 2026, and my sisters hold no claim against me. Because my sisters are insiders, the installments that I paid during the year before the Petition Date, approximately $413,000 in the aggregate, will be disclosed in my Statement of Financial Affairs. They were payments on a matured, bargained-for obligation, made at a time when the value of my interest in GIP exceeded my debts by a wide margin.

45. My mother's estate remains open in Collier County, Florida, where I serve as personal representative. Under the Family Will Agreement, the estate's tax obligations, if any, are my responsibility under the Family Will Agreement. The accountant I have engaged is reviewing the estate's filings together with my own, and any claim of the taxing authorities arising from the estate will be scheduled and addressed in this case.

**D. Environmental Matters**

46. The Property has been in industrial and maritime use for more than a century. Its environmental condition was studied in a Phase I environmental site assessment dated June 1, 2022, prepared by Partner Engineering and Science, Inc., and in a Phase II investigation obtained by the Original Lender in connection with the 2024 closing, both of which are identified in the Environmental Indemnity and will be made available to prospective purchasers. GIP resolved an

enforcement matter with the New York State Department of Environmental Conservation concerning fill placed at the Property in 2006 by an order on consent entered in 2007, and to my knowledge there is no open environmental enforcement proceeding against GIP or the Property. My obligations under the Environmental Indemnity are contingent, and I am aware of no claim under it.

## VI.

## How I Intend to Proceed

47. During the beginning stages of this Chapter 11 Case, I will (a) file my schedules of assets and liabilities and statement of financial affairs within the time permitted by Bankruptcy Rule 1007(c), as may be extended; (b) apply to retain Greenberg Traurig as my counsel; and (c) with GIP, continue the sale process under KBC without interruption.

48. I am advised by counsel that, as an individual debtor in chapter 11, my earnings from services performed after the Petition Date, if any, are property of the estate, that I must account for any for any such earnings and for the estate's other receipts and disbursements in monthly operating reports, and that, unless the Court orders otherwise for cause, my discharge will not be granted until I have completed all payments under my plan. I accept those obligations.

## VII.

## Information Required by Local Rule 1007-4

49. In accordance with Local Rule 1007-4, this Section and the schedules attached hereto set forth the information that the rule requires. Where I state that information will be provided in my Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules"), I will file them on or before the fourteenth day after the Petition Date in accordance with Bankruptcy Rule 1007(c), as such deadline may be extended, and will supplement this Declaration at that time to the extent necessary. Nothing in this Section or in the attached

schedules is an admission of the validity, priority or amount of any claim, and if they differ from the Schedules, the Schedules control.

50. Pursuant to Local Rule 1007-4(a)(i) and (ii), I am not a small business debtor within the meaning of section 101(51D) of the Bankruptcy Code, because my aggregate noncontingent liquidated debts exceed the statutory limit, and I am not a single asset real estate debtor within the meaning of section 101(51B) of the Bankruptcy Code, because I am an individual whose principal asset is the Shares and I do not own the Property directly.

51. Pursuant to Local Rule 1007-4(a)(iii), the nature of my affairs and the circumstances leading to the commencement of this case are described in Sections I through VI above.

52. Pursuant to Local Rule 1007-4(a)(iv) and (v), this case was not originally commenced under chapter 7, 12 or 13 of the Bankruptcy Code, and no committee was organized before the commencement of this case.

53. Pursuant to Local Rule 1007-4(a)(vi), I incorporate by reference the list of the holders of the twenty (20) largest unsecured claims against me, excluding insiders and holders of priority claims, filed with my petition on Official Form 104, which sets forth for each creditor its name and mailing address, the name, telephone number and e-mail address of a contact person, the nature and amount of its claim, and whether the claim is contingent, unliquidated or disputed. The amounts shown are estimates as of the Petition Date.

54. Pursuant to Local Rule 1007-4(a)(vii), Schedule 1 lists the holders of the largest secured claims against me, the amount of each claim, a description and an estimate of the value of the collateral securing it, and whether the claim or lien is disputed.

55. Pursuant to Local Rule 1007-4(a)(viii), Schedule 2 sets forth a summary of my assets and liabilities.

56. Pursuant to Local Rule 1007-4(a)(ix), I have no publicly held securities.

57. Pursuant to Local Rule 1007-4(a)(x), the only property of mine in the possession or custody of a custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor is Certificate No. 08 for the Shares, with the stock power delivered with it, which is held as pledgee by the Lender, 699 Columbia Holdings, LLC, c/o Golden East Investors, LLC, 95-20 63rd Road, Suite S, Rego Park, New York 11374, or by its counsel, Herrick, Feinstein LLP, Attn: Avery S. Mehlman, Esq., 2 Park Avenue, New York, New York 10016. The only proceeding relating to the Shares is the Auction, which is not pending in any court and is stayed by the commencement of this case. The reserve and operating accounts of GIP that the Lender holds or controls under the Loan documents are property of GIP.

58. Pursuant to Local Rule 1007-4(a)(xi), I do not operate a business as a sole proprietor. I conduct my affairs from my residence at 364 Henry Street, Brooklyn, New York 11201, which I own, and from GIP's offices at 691 Columbia Street, Brooklyn, New York 11231, which GIP owns as part of the Property. I hold no lease of either.

59. Pursuant to Local Rule 1007-4(a)(xii), my significant assets are the Shares, the certificate for which is held in New York, New York, as described above; my residence at 364 Henry Street, Brooklyn, New York; and my interests in the Queens LLCs, which own the Queens Parcels in the Arverne section of Queens, New York. GIP's principal asset, the Property, is located at 685–747 Columbia Street, Brooklyn, New York. My books and records, and those of GIP and the Queens LLCs, are kept at GIP's offices at 691 Columbia Street ~~and at my residence~~,

and certain records are held by my accountants and counsel. I hold no assets outside the territorial limits of the United States.

60. Pursuant to Local Rule 1007-4(a)(xiii), Schedule 3 lists the nature and present status of each action or proceeding, pending or threatened, against me or my property where a judgment against me or a seizure of my property may be imminent.

61. Pursuant to Local Rule 1007-4(a)(xiv), (xv) and (xvi), I am an individual and have no senior management; my role in the management of GIP is described in Section I above. [I have no employees, and the personnel who work at the Terminal are employed and paid by GIP],[ so there is no payroll to be paid by me for the thirty-day period following the Petition Date]. I have not retained any financial or business consultant; KBC is engaged by GIP, not by me, and is compensated by GIP by commission upon a closing.

62. Pursuant to Local Rule 1007-4(a)(xvii), Schedule 4 sets forth my estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the thirty-day period following the Petition Date.

63. Pursuant to Local Rule 1007-4(a)(xviii), my current insurance policies are (a) a homeowner’s policy covering 364 Henry Street issued by Western World Insurance Co., for the policy period April 2026-April 2027. GIP maintains property and liability insurance on the Property, under which the Lender is named as mortgagee and additional insured.

64. Pursuant to Local Rule 1007-4(a)(xix), I do not maintain a personal bank account. The accounts through which my business affairs have been conducted are accounts of GIP and of my other entities, including GIP’s operating account at Santander Bank that is subject to the Lender’s control under the Loan documents, and they are not property of my estate.

65. Pursuant to Local Rule 1007-4(a)(xx), the additional information that I believe will assist the Court in understanding the prospects for my rehabilitation is set forth in Sections III through VI above.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of November, 2026, at Brooklyn, New York.

/s/ ______________________________
John Quatrato Quadrozzi Jr.
Debtor and Debtor in Possession

# SCHEDULE 1

## Holders of the Largest Secured Claims

## (Pursuant to Local Rule 1007-4(a)(vii))

Pursuant to Local Rule 1007-4(a)(vii), the following lists the holders of the largest secured claims against me, the amount of each claim, a description and an estimate of the value of the collateral securing it, and whether the claim or lien is disputed.

| Creditor and Contact | Amount of Claim | Collateral and Estimated Value | Disputed? |
|---|---|---|---|
| 699 Columbia Holdings, LLC<br>c/o Golden East Investors, LLC<br>Attn: Josh Blisko<br>95-20 63rd Road, Suite S, Rego Park, NY 11374<br><br>Counsel: Herrick, Feinstein LLP<br>Attn: Avery S. Mehlman, Esq.<br>2 Park Avenue, New York, NY 10016<br>amehlman@herrick.com | $67,101,232.23 asserted as of November 3, 2026, of which $53,500,000 is principal and $13,125,333.36 is default interest, plus $35,666.67 per day thereafter. | Pledge of the 100 shares of GIP. The Loan is also secured by GIP's mortgage on the Terminal and the Queens LLCs' mortgage on the Queens Parcels. The Terminal was appraised at $109,000,000 in March 2024 and valued by Cushman & Wakefield in August 2026 at $109.9 million to $133.4 million as is; the Shares are worth GIP's equity above the Loan. | Lien on stock is disputed, to the extent that GIP owns property other than the Terminal subject to the mortgage; the stock pledge was not intended to provide any indirect lien on such other property. Amount disputed in part, including default interest, the exit fee and the Lender's fees. The Debtor's liability under the Guaranties is contingent and disputed. |
| Federal National Mortgage Association<br>c/o Berkman Henoch Peterson Peddy & Fenchel, P.C.<br>100 Garden City Plaza, Garden City, NY 11530 | Approximately $1,600,000 asserted, on principal of $490,104.15. | First mortgage on 364 Henry Street, Brooklyn, NY (Block 295, Lot 29).<br><br>Estimated value is approximately $2 million. | Validity and amount disputed; counterclaims asserted in the pending foreclosure action. |
| The City of New York<br>c/o New York City Law Department<br>100 Church Street, New York, NY 10007 | $214,000 judgment entered July 2, 2026, plus any penalties the court allows after September 13, 2025. | Judgment lien on 364 Henry Street by docketing in Kings County. | Amount of the judgment not disputed; further penalties disputed and held in abeyance. |
| | | | |

# SCHEDULE 2

## Summary of the Debtor's Assets and Liabilities

## (Pursuant to Local Rule 1007-4(a)(viii))

Pursuant to Local Rule 1007-4(a)(viii), the following is a summary of the Debtor's assets and liabilities as of the Petition Date, based on the Debtor's estimates. Amounts marked "TBD" will be stated in the Schedules.

| Assets | Estimated Value |
|---|---|
| 100 shares of GIP (the Shares), representing GIP's equity in the Property; the Terminal alone was appraised at $109,000,000 in March 2024 and valued at $109.9 million to $133.4 million as is in August 2026, above the Loan (asserted at $67,101,232.23) and GIP's other liabilities | TBD |
| 364 Henry Street and 129 Congress Street, Brooklyn (residence) | TBD |
| Membership interests in the Queens LLCs, which own the Queens Parcels (mortgaged to the Lender) | TBD |
| Interests in other real estate entities | TBD |
| Personal property, including vehicles and household goods | TBD |
| Counterclaim against Fannie Mae | Unliquidated |

| Liabilities | Amount |
|---|---|
| 699 Columbia Holdings, LLC, under the Pledge and the Guaranties (secured by the Shares; amount disputed in part; guaranty liability contingent) | $67,101,232.23 asserted |
| Federal National Mortgage Association (mortgage on 364 Henry Street; amount disputed) | Approx. $1,600,000 asserted |
| The City of New York (judgment of July 2, 2026; further penalties in abeyance) | $214,000 |
| | |
| Federal, New York State and New York City income taxes for tax years 2019 through 2025, returns not yet filed | Unliquidated |
| | |
| Professional fees, utilities and other unsecured obligations | TBD |

# SCHEDULE 3

## Summary of Legal Actions Against the Debtor

## (Pursuant to Local Rule 1007-4(a)(xiii))

Pursuant to Local Rule 1007-4(a)(xiii), the following lists the nature and present status of each action or proceeding, pending or threatened, against the Debtor or his property where a judgment against the Debtor or a seizure of his property may be imminent.

| Matter | Court/Forum | Nature | Status |
|---|---|---|---|
| Public sale of the Shares noticed by 699 Columbia Holdings, LLC under UCC Article 9 | None (non-judicial disposition of collateral) | Disposition of the Shares; the Lender may credit bid its claim | Noticed September 10, 2026; auction set for November 12, 2026. Stayed by the commencement of this case. |
| *The City of New York and the New York City Landmarks Preservation Commission v. John Q. Quadrozzi, Jr.*, Index No. 8442/2010 | Supreme Court of the State of New York, Kings County | Enforcement of the Landmarks Law as to 364 Henry Street and 129 Congress Street; 2013 stipulation with $1,000 per week penalty for late completion | Order and Judgment entered July 2, 2026, for $214,000. Penalties after September 13, 2025, held in abeyance pending the Debtor's further motion to modify the stipulation. Stayed as to the Debtor. |
| *Federal National Mortgage Association v. John Q. Quadrozzi, Jr.*, Index No. 3017/2014 | Supreme Court of the State of New York, Kings County | Foreclosure of a 2000 mortgage on 364 Henry Street; approximately $1.6 million claimed; counterclaims asserted by the Debtor; validity and amount of claim disputed | Pending since February 2014; contested; no judgment of foreclosure. Stayed. |
| Notices of violation issued by City agencies against the Debtor with respect to his residential properties | New York City Office of Administrative Trials and Hearings (OATH) | Civil penalties | Outstanding; being reconciled. Stayed. |

To the Debtor's knowledge, no other action or proceeding is pending or threatened against the Debtor or his property in which a judgment against the Debtor or a seizure of his property may be imminent.

## SCHEDULE 4

### Thirty-Day Schedule of Estimated Cash Receipts and Disbursements

### (Pursuant to Local Rule 1007-4(a)(xvii))

Pursuant to Local Rule 1007-4(a)(xvii), the following is the Debtor's estimate of his cash receipts and disbursements for the thirty-day period following the Petition Date, exclusive of professional fees. GIP's own receipts and disbursements are not property of the Debtor's estate and will be reported in the periodic reports required by Bankruptcy Rule 2015.3.

| Item | Amount |
|---|---|
| **Receipts** | |
| Compensation from owned companies | N/A |
| Other receipts | N/A |
| Total estimated receipts | N/A |
| **Disbursements** | |
| Household and living expenses | N/A |
| Insurance premiums (homeowner) | $938 |
| Utilities and property charges (including taxes) for 364 Henry Street | $2,895 |
| Total estimated disbursements | $3,833 |
| **Net cash gain (loss)** | |
| **Obligations expected to accrue but remain unpaid** | |
| Installments on the Fannie Mae mortgage (disputed; stayed) | N/A |
| Interest on the Lender's claim under the Guaranties, at the rate the Lender asserts (approximately $1,070,000 per month; disputed). GIP pays insurance and the real estate taxes on the Property. | N/A |
| Landmarks penalties after September 13, 2025, if allowed by the state court | Unknown |
| **Receivables expected to accrue but remain unpaid** | None |

**EXHIBIT A**

(Notice of Disposition of Collateral dated September 10, 2026)

**699 COLUMBIA HOLDINGS, LLC**
**c/o Golden East Investors, LLC**
**95-20 63rd Road, Suite S.**
**Rego Park, NY 11374**

September 10, 2026

**FEDERAL EXPRESS OVERNIGHT AND REGULAR MAIL**
John Quadrozzi, Jr.
364 Henry Street
Brooklyn, New York 11201

**FEDERAL EXPRESS OVERNIGHT AND REGULAR MAIL**
VERNAM BASIN TERMINAL, LLC
691 Columbia Street
Brooklyn, New York 11231
Attention: John Quadrozzi, Jr.

**FEDERAL EXPRESS OVERNIGHT AND REGULAR MAIL**
GOWANUS INDUSTRIAL PARK, INC.
691 Columbia Street
Brooklyn, New York 11231
Attention: John Quadrozzi, Jr.

**FEDERAL EXPRESS OVERNIGHT AND REGULAR MAIL**
VBX-4.16069.1, LLC
691 Columbia Street
Brooklyn, New York 11231
Attention: John Quadrozzi, Jr.

**FEDERAL EXPRESS OVERNIGHT AND REGULAR MAIL**
VBX-4.16069.30 LLC
691 Columbia Street
Brooklyn, New York 11231
Attention: John Quadrozzi, Jr.

**FEDERAL EXPRESS OVERNIGHT AND REGULAR MAIL**
Cox Padmore Skolnik & Shakarchy LLP
630 Third Avenue, 23rd Floor
New York, New York 10017
Attention: Jacob S. Shakarchy, Esq

**Re: NOTICE OF DISPOSITION OF COLLATERAL – Ownership Interest in GOWANUS INDUSTRIAL PARK, INC.**

Property Encumbered by the Loan (as defined below) (the "Premises"):

| | |
|---|---|
| Parcel 1:<br>685/747 Columbia Street<br>Brooklyn, New York<br>Block: 614, Lot:1<br>County: Kings | Parcel 2:<br>Hessler Avenue<br>Arverne, New York 11692<br>Block: 16069, Lot: 1<br>County: Queens |
| Parcel 3:<br>Gouverneur Avenue<br>Arverne, New York 11692<br>Block: 16069, Lot: 30<br>County: Queens | Parcel 4:<br>73-02 Amstel Boulevard<br>Arverne, New York 11692<br>Block: 16070, Lot:1<br>County: Queens |

Borrower Names: Gowanus Industrial Park, Inc., VBX-4.16069.1, LLC, VBX-4.16069.30 LLC, Vernam Basin Terminal, LLC (collectively, the "*Borrower*")

Pledgor/ Guarantor Name: John Quadrozzi, Jr. ("*Pledgor*")

Loan Description: Consolidated, Amended and Restated Note dated as of April 26, 2024, in the original principal amount of $53,500,000.00, made by Borrower in favor of Columbia Industrial Capital LLC, as administrative agent for the benefit of Columbia Industrial Capital LLC and Columbia Industrial Capital Offshore LLC (collectively, "*Original Lender*") (the "*Note*", and the loan evidenced thereby, the "*Loan*"; and the Note, Mortgage (as defined below), Pledge Agreement (as defined below), and all other documents executed and/or delivered in connection with the Loan, collectively, the "*Loan Documents,*"), as subsequently assigned pursuant to the Assignments (as defined below)

Noteholder: 699 Columbia Holdings, LLC ("*Secured Party*" or "*Lender*")

Ladies and Gentlemen:

This letter serves as a notice of foreclosure by Secured Party pursuant to Sections 9-611 and 9-612 of the New York Uniform Commercial Code (the "UCC") and that certain Pledge and Security Agreement dated as of April 26, 2024 ("*Pledge Agreement*") between John Quadrozzi, Jr., the Sole Shareholder of Gowanus Industrial Park, Inc., and Original Lender to secure the obligations of Borrower in connection with the Loan, pursuant to the Modification, Consolidation, Extension and Spreader Agreement dated as of April 26, 2024 (the "*Mortgage*") between Borrower and Original Lender, as subsequently assigned to Secured Party by Assignment of Mortgage, Transfer of Loan Documents, Assignment and Assumption Agreement, and Allonge to Promissory Note, each between Original Lender, as assignor, and Secured Party as assignee, and dated as of October 31, 2025, (together with all other documents executed and/or delivered in connection with the transfer and assignment of the Loan and Loan Documents, the "*Assignments*").[1]

All of the Loan Documents and Assignments are held by Secured Party.

As you were previously notified by Secured Party by letter dated November 4, 2025 (the "*Notice of Maturity*"), Events of Default have occurred and are continuing under the Mortgage as a result of, among other things, your failure to pay all sums due and owing Lender under the Loan Documents, including, but not limited to, the unpaid principal balance of the Loan, on the Maturity Date of November 1, 2025, pursuant to Section 7.1(b) of the Mortgage.

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Loan Documents.

Borrower and Pledgor therefore are in default of their obligations under the Loan Documents.

Pursuant to the terms of the Pledge Agreement and the UCC, Secured Party will sell at public auction (the "*Auction*"): (i) one hundred (100) shares of corporate stock in Gowanus Industrial Park, Inc. (the "*Pledged Interests*"), which constitutes one hundred percent (100%) of the corporate shares therein, and (ii) certain rights and property related thereto pledged by the Pledgor pursuant to the Pledge Agreement (collectively, the "*Collateral*"), which comprises security for Borrower's obligations under the Loan Documents.

Pledgor is hereby notified of each of the following:

**1.** **Unpaid Indebtedness**: As of the date of this notice, the total outstanding balance of Borrower's obligations under the Loan Documents includes the original principal amount of $53,500,000.00 plus interest, and such other amounts as may be due under the Loan Documents, including, without limitation, late fees, Default Rate interest, and reasonable attorneys' fees, which amounts shall continue to accrue in accordance with the Loan Documents. Borrower is entitled to an accounting of the unpaid indebtedness secured by the Collateral that Secured Party intends to sell and may request such an accounting by contacting Secured Party, which will provide such an accounting at no charge.

**2.** **Time and Place of Auction:** The Sale shall be a public auction sale to be conducted by a licensed auctioneer in conjunction with Lender's broker, NEWMARK (John Howley [john.howley@nmrk.com] and John Daniels [john.daniels@nmrk.com], the "*Broker*") pursuant to the Terms of Sale as may be modified or subject to additional conditions posted to the Data Room maintained by the Broker in connection with the Sale (the "*Data Room*") (https://buildout.com/sharing/685747-columbia-street-brooklyn-sale). Lender reserves the right to amend at any time prior to the date of the Sale by posting revised Terms of Sale to the Data Room. Lender further reserves the right to amend the Terms of Sale and to impose additional or alternate conditions of Sale on the date of the Sale by announcement made at the Sale. Any announcements made at the Sale shall supersede any previously posted Terms of Sale.

The Auction will be conducted by a licensed auctioneer on behalf of Secured Party on **November 12, 2026 at 11:00 am** prevailing Eastern Time at the offices of the Secured Party counsel, Herrick, Feinstein LLP, at 2 Park Avenue, New York, New York 10016, and conducted via video conference (link to be provided to all registered participants). Borrower is invited to attend the auction. All interested prospective purchasers that meet the qualifications for bidding are invited to attend and bid at the auction and will have the option to attend either via Zoom (or similar online platform) or in-person.

**3.** **Terms of Sale:** The terms of sale, which remain subject to change, are enclosed with this Notice as **Exhibit A**.

**4.** **No Representations:** The Collateral is being offered as a single lot, "as-is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured

Party and each bidder must make its own inquiry regarding the Collateral. There is no warranty relating to title, possession, quiet enjoyment, or the like in this disposition. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

**5.** **Public Notice:** A copy of the UCC Public Sale Notice, which may be published, is enclosed for Borrower's information as **Exhibit B**.

The Secured Party reserves the right to: (i) credit bid; (ii) set a minimum reserve price; (iii) determine the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced in these Terms of Sale; (iv) reject all bids (including without limitation any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the Sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made); (v) accept a lower bid if the bid is on terms Secured Party determines are more favorable to Secured Party or is from a bidder that, in Secured Party's determination, offers a more certain likelihood of execution; (vi) terminate or adjourn the Sale to another date at any time and from time to time in its sole and absolute discretion, without further publication or notice, and, if it does so, to sell the Collateral at a later public or private sale; (vii) impose any other commercially reasonable conditions upon the sale of the Collateral as the Secured Party may deem proper; (viii) designate a nominee, affiliate, or assignee to take title to the Collateral at closing; and (ix) modify the Terms of Sale.

Each prospective bidder (other than the Secured Party or its affiliate) will be required to represent in writing to the Secured Party that such bidder: (i) has the financial ability to tender the required deposit and the purchase price for the Collateral; and (ii) will comply with the requirements to participate in the Sale as more specifically set forth in the Terms of Sale posted in the Data Room. **Meeting the foregoing requirements shall be solely the responsibility of each prospective bidder, and shall be at the sole risk, cost, and expense of each such bidder.**

SECURED PARTY RESERVES ALL RIGHTS PURSUANT TO THE LOAN DOCUMENTS TO SEEK RECOVERY FROM BORROWER AND/OR ANY GUARANTOR FOR ANY DEFICIENCY IF THE PROCEEDS OF ANY SALE ARE INSUFFICIENT TO SATISFY BORROWER'S OBLIGATIONS UNDER THE LOAN DOCUMENTS.

NOTICE TO OTHER LIENHOLDERS: In an abundance of caution, Secured Party may provide notice to all parties that have allegedly asserted security or other interests in the Collateral and/or other assets of Borrower. By providing notice to any such party, Secured Party does not acknowledge that such party possesses valid or perfected security interests in Borrower's assets, or the priority thereof, and Secured Party specifically reserves all rights to challenge or contest any assertion of a superior or priority security interest by any third party in the Collateral.

Very truly yours,

Name: Orah Mansher
Title: Authorized Signatory

# EXHIBIT A

# TERMS OF SALE

**NOTICE IS HEREBY GIVEN** that on **November 12, 2026, at 11:00 a.m.** prevailing Eastern Time, in the office of Herrick, Feinstein LLP, 2 Park Avenue, New York, New York 10016, with simultaneous remote access through a video-conference link to be provided to all registered participants, an auctioneer on behalf of 699 Columbia Holdings, LLC ("***Secured Party***"), will offer for sale the following collateral, as permitted pursuant to Article 9 of the Uniform Commercial Code of the State of New York and the terms of a Pledge and Security Agreement dated April 26, 2024 (the "***Pledge Agreement***") between John Quadrozzi, Jr., the sole shareholder of Gowanus Industrial Park, Inc., and original lender Columbia Industrial Capital LLC, as administrative agent for the benefit of Columbia Industrial Capital LLC and Columbia Industrial Capital Offshore LLC (collectively, "***Original Lender***") and subsequently assigned to Secured Party by Assignment of Modification, Consolidation, Extension and Spreader Agreement; Transfer of Loan Documents; Assignment and Assumption Agreement; and Allonge to Promissory Note, each between Original Lender, as assignor, and Secured Party as assignee, and dated as of October 31, 2025 (together with all other documents executed and/or delivered in connection with the transfer and assignment of the Loan and Loan Documents, the "***Assignments***"). The Secured Party is offering the Collateral for sale in connection with the foreclosure on the pledge of such Collateral.

Capitalized terms not otherwise defined in these Terms of Sale (the "***Terms of Sale***") have the meanings set forth in the Notice of Disposition of Collateral, dated September 9, 2026 (the "***Notice of Disposition***"), to which these Terms of Sale are attached.

Secured Party is offering for sale (i) one hundred (100) shares of corporate stock in Gowanus Industrial Park, Inc. (the "***Pledged Interests***"), which constitutes one hundred percent (100%) of the corporate shares therein, and (ii) certain rights and property related thereto pledged by the Pledgor pursuant to the Pledge Agreement (collectively, the "***Collateral***"), which comprises security for Borrower's obligations under the Loan Documents. By the Loan Documents, Borrower covenants, warrants, and represents that Gowanus Industrial Park, Inc. is the actual, record and beneficial owner of the fee estate in the property located at 685/747 Columbia Street Brooklyn, New York, Kings County, Block: 614, Lot: 1 ("***Parcel 1***").

The sale is being made in connection with the foreclosure on a pledge of the Collateral pursuant to the Loan Documents, under which Pledgor granted to Secured Party a first priority security interest in all Pledgor's right, title, and interest in debtor Gowanus Industrial Park, Inc., including, without limitation, the Collateral.

Secured Party will provide to prospective bidders a click-through Confidentiality Agreement to be completed in order to obtain access to an online data room ("***Data Room***") (https://buildout.com/sharing/685747-columbia-street-brooklyn-sale) maintained by Secured Party's broker ("***Broker***") that contains certain relevant information that Secured Party possesses (but without representation or warranty of any kind by Secured Party as to the accuracy of the same) concerning, among other things, the Collateral and the amounts due to Secured Party under the Loan Documents, as well as (i) an Assignment and Assumption Agreement memorializing the sale of the Collateral to the winning bidder, (ii) a Memorandum of Sale, (iii) a Certificate of Sale

and Fact, and (iv) a Transfer Statement, which are, collectively, the documents that will be used to memorialize the winning bidder's purchase (items (i) through (iv) collectively defined as the "***Transaction Documents***"). Certain additional documentation may be made available to prospective bidders from time to time, if available, upon request from such prospective bidders. Prospective bidders are encouraged to review all Transaction Documents and perform such due diligence as they deem necessary in advance of the date of the foreclosure sale. Any requests for additional information concerning the Collateral should be directed to Secured Party's counsel at the address set forth in the Notice of Disposition.

The Collateral will be offered in a single lot. The Collateral is being sold strictly on an "AS IS AND WHERE IS" BASIS, AND (i) WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY SECURED PARTY (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY), INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE EXISTENCE OR NONEXISTENCE OF OTHER LIENS AGAINST THE COLLATERAL, THE QUALITY, CONDITION OR DESCRIPTION OF THE COLLATERAL, AND/OR THE VALUE OF ANY OF THE FOREGOING, AND (ii) WITHOUT ANY RECOURSE WHATSOEVER AGAINST SECURED PARTY OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF SECURED PARTY. THERE IS NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION.

The successful bidder must satisfy all the applicable requirements established by Secured Party or its representatives, as set forth in these Terms of Sale. Without limitation to the foregoing, each bidder must (i) satisfy the requirements outlined in the Certification (as defined below), and (ii) be an "accredited investor," as such term is defined in Rule 501(a) of Regulation D promulgated under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"). Meeting the requirements set forth in the Certification and those of the Securities Act shall be at the sole risk, cost, and expense of a prospective bidder. Prospective bidders are advised that the failure to meet such requirements may result in the inability of a successful bidder to purchase the Collateral. Secured Party reserves the right to require evidence satisfactory to Secured Party, in its sole and absolute discretion, that (a) a prospective bidder has the willingness, ability, and financial wherewithal to purchase the Collateral within the time prescribed herein, which evidence shall include current financial statements and/or a written representation from such prospective bidder's sponsors, depository bank, or lender regarding such bidder's source of funds, including any equity or debt financing; (b) a prospective bidder has the ability to satisfy the requirements set forth in the Certification and of the Securities Act before the date of the sale; (c) a prospective bidder has authorization and approval from such prospective bidder's board of directors, owners, partners, members, or comparable governing body to make a binding and irrevocable bid and to consummate the purchase of the Collateral if such prospective bidder is the winning bidder; and (d) a prospective bidder's representative or agent who will attend the foreclosure sale (virtually or in person) is duly authorized to make a binding and irrevocable bid on behalf of such prospective bidder. If a prospective bidder is a special-purpose entity or an entity with creditworthiness that is, in Secured Party's sole and absolute judgment, insufficient to support the requirements herein, Secured Party reserves the right to require additional credit support in the form of a guaranty by a creditworthy affiliate of such prospective bidder or other appropriate credit support.

Secured Party, or an affiliate of Secured Party, reserves the right to (i) credit bid; (ii) set a minimum reserve price; (iii) determine the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced in these Terms of Sale; (iv) reject all bids (including without limitation any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the Sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made); (v) accept a lower bid if the bid is on terms Secured Party determines are more favorable to Secured Party or is from a bidder that, in Secured Party's determination, offers a more certain likelihood of execution; (vi) terminate or adjourn the Sale to another date at any time and from time to time in its sole and absolute discretion, without further publication or notice, and, if it does so, to sell the Collateral at a later public or private sale; (vii) impose any other commercially reasonable conditions upon the sale of the Collateral as the Secured Party may deem proper; (viii) designate a nominee, affiliate, or assignee to take title to the Collateral at closing; and (ix) modify these Terms of Sale.

The Secured Party further reserves the right to restrict prospective bidders to those who will represent that they are purchasing the Collateral for their own account for investment not with a view to the distribution or resale of such Collateral, to verify that each certificate for the Collateral to be sold bears a legend substantially to the effect that such interests have not been registered under the Securities Act, and may not be disposed of in violation of the provisions of the Securities Act and to impose such other limitations or conditions in connection with the sale of the Collateral as the Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

The Collateral has not been and will not be registered under the Securities Act or any applicable state securities laws and may not be sold or transferred without registration under the Securities Act and applicable state securities law or the availability of valid exemptions from such registration requirements.

Secured Party will consider bids only from persons to which in its sole and absolute judgment such sale may lawfully be made. Bidders are notified that (i) the Collateral is required to be acquired for the account of the bidder and not with a view to resale or distribution, and (ii) the bidder may not resell the Collateral without compliance with the registration requirements of the Securities Act and the regulations of the Securities and Exchange Commission thereunder and applicable state securities laws or pursuant to valid exemptions therefrom.

A bid by any person will be deemed to be a representation that such bidder has sufficient knowledge and experience in business and financial matters to evaluate properly the merits and risks of investment in the Collateral, that such bidder has had such access to information concerning the Collateral as such bidder deems necessary to make an informed investment decision, and that such bidder is qualified to become a transferee under any transfer restrictions applicable to the Collateral. Further, such bidder may be required by Secured Party, acting in its sole and absolute discretion, to establish that such bidder is able to bear the economic risks involved in investment in the Collateral.

**For a prospective bidder (other than Secured Party) to be a qualified bidder (a "Qualified Bidder") and eligible to bid at the public auction, each such prospective bidder**

**must:**

(1) by **<u>3:00 P.M. prevailing Eastern Time on November 5, 2026</u> (with time being of the essence)**, execute and deliver to Lender's Broker, NEWMARK, by email to John Howley (john.howley@nmrk.com) and John Daniels (john.daniels@nmrk.com), a written certification (the "***<u>Certification</u>***") on the form attached as **<u>Appendix 1</u>**;

(2) **by <u>3:00 P.M. prevailing Eastern Time on November 5, 2026</u> (with time being of the essence)**, provide to the Broker by email to John Howley (john.howley@nmrk.com) and John Daniels (john.daniels@nmrk.com) a proof of readily available funds, satisfactory to Secured Party, acting in its sole and absolute discretion, equal to or greater than any bid that the prospective bidder will make;

(3) **by <u>3:00 P.M. prevailing Eastern Time on November 5, 2026</u> (with time being of the essence)**, register as a prospective bidder at the auction with the Broker, by email to John Howley (john.howley@nmrk.com) and John Daniels (john.daniels@nmrk.com); and

(4) by **<u>3:00 P.M. prevailing Eastern Time on November 9, 2026</u> (with time being of the essence)** make a $2,000,000 deposit (the "***<u>First Deposit</u>***"), which deposit shall be refundable only to non-successful bidders (any such refund to occur within three (3) business days following the auction).

(5) **<u>be present at the auction, either virtually or in person</u>.** Any prospective bidder that fails to comply with these requirements, with time being of the essence in each case, will not be a Qualified Bidder. Any person or entity that is not a Qualified Bidder will not be permitted to bid at the auction. Secured Party is deemed to be a Qualified Bidder.

Interested bidders or observers who wish to physically attend the auction must notify Broker, by email to John Howley (john.howley@nmrk.com), John Daniels (john.daniels@nmrk.com), and Avery Mehlman, Esq. (amehlman@herrick.com) in writing **by 3:00 P.M. <u>prevailing Eastern Time on November 10, 2026</u> (with time being of the essence)**. For the avoidance of doubt, either physical presence at the live auction or remote participation via video conference will constitute presence at the live auction. The auction will be recorded by means of audio and visual recording, and by attending the auction each attendee consents to such recording. A Qualified Bidder may, depending on the answers provided in the Certification, be required to confirm to Secured Party that (i) its purchase of the Collateral is in compliance with all applicable federal and state laws, and (ii) it can comply with the certifications set forth in the Certification relating to such bidder's ability to satisfy the requirements set forth in the Certification.

Prospective bidders are advised that Secured Party may be in possession of material information that prospective bidders may not have.

Prospective bidders further understand and agree that Secured Party makes no representations or warranties concerning the Collateral or the Loan. To the extent any financial information is provided by Secured Party, Secured Party makes no representations or warranties

concerning the accuracy or completeness of this financial information, and all bidders agree and understand that they are not relying on any representations, warranties, assurances, statements (oral or written), or understandings made by Secured Party with respect to the Collateral or its value.

The sale will be a public auction to the highest Qualified Bidder. All bids (other than bids submitted by Secured Party) must be for cash.

The minimum bidding increment will be at least $100,000 or such other amount as the auctioneer may announce at the auction. Higher bids will continue to be entertained until the auctioneer has determined that he has received the highest bid from a Qualified Bidder. No offers may be withdrawn once made and instead shall be irrevocable until the earlier of closing or receipt of written rejection from Secured Party. No sale will be final until accepted in writing by Secured Party.

Any successful bidder (other than Secured Party or an affiliate of Secured Party) must provide to Secured Party within two (2) business days after the conclusion of the auction, **TIME BEING OF THE ESSENCE,** by certified check, bank check, or wire transfer of immediately available funds payable to Secured Party, an additional non-refundable deposit on the sale price (the "***Second Deposit***") in an amount that, aggregated with the First Deposit, will constitute not less than 10% of the successful bid amount (such First Deposit and Second Deposit being collectively the "***Deposit***").

The entire balance of the successful bid amount (the "***Purchase Price***") shall be payable in immediately available funds (wire transferred from, or certified check drawn on and certified by, a U.S. commercial bank that is a member of the Federal Reserve system) within thirty (30) calendar days after the conclusion of the auction, **TIME BEING OF THE ESSENCE**. Secured Party may, in its sole and absolute discretion, extend such 30-calendar-day period, provided that the Deposit shall remain non-refundable and the winning bidder enters into a purchase and sale agreement acceptable to Secured Party. The Deposit and Purchase Price shall be paid to Secured Party in accordance with written instructions to be provided by Secured Party. If Secured Party credit bids at the sale (as it anticipates doing) part of, or all, the amount owed to it under the Loan Documents as its bid, payment by Secured Party may be in the form of some of, or all, the indebtedness held under the Loan Documents on the same basis as if the amount of the indebtedness outstanding under the Loan Documents that Secured Party bids at the sale were cash and immediately available good, collected funds.

If Secured Party, or an affiliate of Secured Party, is not the highest Qualified Bidder for the Collateral, Secured Party reserves the right to designate a back-up bidder. The back-up bidder may be Secured Party, and Secured Party's back-up bid may be by credit bid in whole or in part. If the highest Qualified Bidder does not timely fund the Deposit or the entire balance of the Purchase Price as set forth in the above paragraphs, then the back-up bidder will be notified within five (5) business days after the highest Qualified Bidder failed to timely fund the Deposit or entire balance of the purchase price, as the case may be (the "***Back-Up Bidder Notice***"), and will be obligated, within three (3) business days after receiving the Back-Up Bidder Notice from Secured Party, to execute a confirmation of sale in a form to be provided by Secured Party and deliver the Deposit to Secured Party. If a back-up bidder (other than Secured Party) is ultimately selected as the

winning bidder for the Collateral, the back-up bidder will be required to pay the balance of the Purchase Price for the Collateral to be purchased by the back-up bidder by certified or bank check, or wire transfer of immediately available funds, no later than thirty (30) calendar days after delivery of the Back-Up Bidder Notice from Secured Party to the back-up bidder, TIME BEING OF THE ESSENCE. The sale of the Collateral to a back-up bidder will otherwise be consummated on the same terms as applicable to the successful bidder at the public auction. If the back-up bidder for the Collateral is Secured Party or an affiliate of Secured Party, then the foregoing requirements will not apply to the purchase of the Collateral and payment for the Collateral may be made by applying the amounts due under the Loan Documents against the Purchase Price as described above.

If the successful bidder or the back-up bidder fails to pay the balance of the Purchase Price, the Deposit will be forfeited to Secured Party as its liquidated damages and the Collateral may, at Secured Party's option, be sold to the next highest bidder. If Secured Party is unable for any reason (other than as set forth in the immediately preceding sentence) to consummate the sale of the Collateral to a successful bidder at the public sale, its sole obligation to the successful bidder will be the return of the bidder's Deposit. By bidding at the auction, each bidder acknowledges that it would not be possible to ascertain Secured Party's actual damages under the circumstances described in this paragraph. A successful bidder or back-up bidder will have no right to postpone or nullify a sale of the Collateral if it is unable to meet any of the requirements set forth in these Terms of Sale relating to the Collateral or its sale.

The winning bidder shall be responsible for paying any taxes and other charges required to be paid in connection with the purchase of the Collateral.

Secured Party reserves the right, upon 24 hours' notice to all prospective bidders that have registered with Broker, to hold the auction entirely as a remote virtual auction.

Dated: New York, New York
September 9, 2026

**Appendix 1**

CERTIFICATION

__________, 2026

**Re:** Certain Collateral belonging to John Quadrozzi, Jr. (the "**Collateral**"), as defined in the Notice of Disposition of Collateral, dated as of September 9, 2026 (the "**Notice of Disposition**")

Ladies and Gentlemen:

The undersigned (the "**Bidder**") has indicated that it is interested in bidding on the "**Collateral**" (as defined in the Notice of Disposition), which will be auctioned in accordance with the Terms of Sale issued by Secured Party with respect to the Collateral (the "**Terms of Sale**"). Capitalized terms not otherwise defined in this Certification have the meaning set forth in the Terms of Sale. This letter constitutes the Certification referenced in the Terms of Sale.

With the understanding that Secured Party will rely upon the representations made in this Certification in connection with the sale of the Collateral, the Bidder certifies to Secured Party as follows:

(a) Bidder is acquiring the Collateral for investment purposes, solely for the Bidder's own account and not with a view to distribution or resale of the Collateral;

(b) Bidder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral;

(c) Bidder will not resell or otherwise hypothecate the Collateral without a valid registration under applicable federal or state laws, including without limitation, the Securities Act of 1933, as amended, or an available exemption;

(d) Bidder's purchase of the Collateral will be in compliance with all applicable federal and state laws;

(e) Bidder will be present at the public auction, whether via physical presence or simultaneous video conference;

(f) Bidder has reviewed and agrees to be bound by the Terms of Sale;

(g) Bidder represents and agrees that, if it is the winning bidder at the auction sale of the Collateral, it will be able to satisfy, and will satisfy, the requirements set forth in the Terms of Sale; and

(h) Bidder further certifies (i) that it has no affiliation with the Pledgor, Borrower, or Guarantor; (ii) the funds to be used by the Bidder to acquire the Collateral are not derived from any unlawful activity; (iii) Bidder is not owned or controlled by, and is not acting on behalf of, any person that is the subject of sanctions administered or enforced by the Office of Foreign

Assets Control, the U.S. Department of State, or any other department or governing agency, and Bidder is in compliance in all material respects with applicable anti-money laundering and anti-terrorism financing laws; and (iv) Bidder has authority to bid and close on the Collateral.

The Bidder acknowledges and agrees that the certifications contained in this Certification may be, and are being, relied upon by Secured Party, and that these certifications will be binding upon the Bidder and its successors and assigns.

The Bidder agrees to indemnify and hold harmless Secured Party from and against any and all claims and out-of-pocket losses, liabilities, and expenses (including, without limitation, attorneys' fees) resulting from or based on any misrepresentation or inaccuracy in the information contained in this Certification that is provided by the Bidder (including any attachments or supplements to this Certification provided by the Bidder).

The Bidder additionally (i) agrees that the sale is and shall be governed by and construed in accordance with the laws of the State of New York; (ii) expressly and irrevocably submits to the exclusive jurisdiction of the Courts of the State of New York located in New York County in connection with any suits, actions or proceedings arising, directly or indirectly, out of or relating to the sale of the Collateral; (iii) waives trial by jury in any such suit, action, or proceeding; (iv) represents and acknowledges that nothing herein or in the Terms of Sale shall give rise to any rights by persons other than Secured Party and Qualified Bidders as defined in the Terms of Sale, and expressly disclaims any and all third-party beneficiary rights; and (v) if any provision hereof, or of the Terms of Sale, or its application to any person, entity or circumstance is held to be invalid by any court, the invalidity or inapplicability of such provision shall not affect any other provision thereof or the application of such provision to any other person, entity or circumstance, and the remaining provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the Bidder has caused this Certification to be duly executed and delivered.

[________________________]

By:________________________________

Name:

Title:

# EXHIBIT B

# UCC PUBLIC SALE NOTICE

**PLEASE TAKE NOTICE** that 699 Columbia Holdings, LLC, a Delaware limited liability company (the "**Secured Party**") offers for sale at public auction on **November 12, 2026 at 11:00 a.m.** prevailing Eastern Time at the offices of Herrick, Feinstein LLP, 2 Park Avenue, New York, New York 10016, with simultaneous access offered via video conference (link to be provided to all registered participants), in connection with a Uniform Commercial Code sale of all rights, title, and interest of John Quadrozzi, Jr. (the "**Pledgor**") in the pledged corporate shares (the "**Pledged Interests**") representing 100% of the shares in Gowanus Industrial Park, Inc., a Delaware corporation, which is the owner of the property located at 685/747 Columbia Street, Brooklyn, NY ("**Parcel 1**") and certain rights and property related thereto pledged under that certain Pledge and Security Agreement (collectively, with the Pledged Interests, the "**Collateral**"), made by the Pledgor in favor of Columbia Industrial Capital LLC as administrative agent for the benefit of Columbia Industrial Capital LLC and Columbia Industrial Capital Offshore LLC (collectively, "**Original Lender**"), dated as of April 26, 2024 (the "**Pledge Agreement**"), as more fully set forth in the Pledge Agreement. Original Lender was granted a security interest in the Collateral to secure the loan ("**Loan**") by Original Lender to Gowanus Industrial Park, Inc., VBX-4.16069.1, LLC, VBX-4.16069.30 LLC, Vernam Basin Terminal, LLC (collectively, the "**Borrower**") and the accompanying guaranty by Pledgor. The Pledge Agreement and Loan were subsequently assigned to Secured Party by Assignment of Modification, Consolidation, Extension and Spreader Agreement; Transfer of Loan Documents; Assignment and Assumption Agreement; and Allonge to Promissory Note, each between Original Lender, as assignor, and Secured Party as assignee, and dated as of October 31, 2025 (together with all other documents executed and/or delivered in connection with the transfer and assignment of the Loan and Loan Documents, the "**Assignments**"). The Secured Party is offering the Collateral for sale in connection with the foreclosure on the pledge of such Collateral.

**PLEASE TAKE FURTHER NOTICE** that the Loan is a single first lien, spread to cover the Premises comprised of Parcel 1 and the below-defined Parcel 2, Parcel 3, and Parcel 4, as more fully set forth in that certain Modification, Consolidation, Extension And Spreader Agreement (Mortgage) (the "**Mortgage**") dated as of April 26, 2024, between Original Lender and Borrower, including the following property: the land and improvements in Parcel 1; the land and improvements located in the County of Queens, City and State of New York, being designated as Block 16069, Lot 1, and known as Hessler Avenue, Arverne, New York 11692 ("**Parcel 2**"); the land and improvements located in the County of Queens, City and State of New York, being designated as Block 16069, Lot 30, and known as Gouverneur Avenue, Arverne, New York 11692 ("**Parcel 3**"); and the land and improvements located in the County of Queens, City and State of New York, being designated as Block 16070, Lot 1, and known as 73-02 Amstel Boulevard, Arverne, New York 11692 ("**Parcel 4**") (Parcel 1, Parcel 2, Parcel 3, and Parcel 4 being, collectively, the "**Premises**").

**PLEASE TAKE FURTHER NOTICE** that at such public auction, the Collateral will be offered as a single lot and not in parts or as separate lots. All interested prospective purchasers that meet the qualifications for bidding are invited to attend and bid at the auction and will have the option to attend either via video conference or in-person. Any individual or entity desiring to bid at the Sale must register with the Lender's broker, NEWMARK ("**Broker**"), as a prospective bidder at the auction by email to John Howley (john.howley@nmrk.com) and John Daniels (john.daniels@nmrk.com), pursuant to the Terms of Sale posted to the online data room maintained by the Broker in connection with the Sale (the "Data Room")

(https://buildout.com/sharing/685747-columbia-street-brooklyn-sale), as the same may be modified prior to sale by subsequent posting to the Data Room or by announcements made at the time of Sale, and must satisfy the requirements for becoming a qualified bidder ("Qualified Bidder"). Any individual intending to attend the Sale in person must additionally contact Broker and Secured Party's counsel by email to John Howley (john.howley@nmrk.com), John Daniels (john.daniels@nmrk.com), and Avery S. Mehlman (amehlman@herrick.com), by no later than 3:00 p.m. prevailing Eastern Time on November 10, 2026, prior to the sale date to obtain access to the offices of Lender's counsel, Herrick, Feinstein LLP, located at 2 Park Avenue, New York, New York.

The Collateral is being offered as a single lot, "as-is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Collateral. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral. THERE IS NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION.

**PLEASE TAKE FURTHER NOTICE** that the Secured Party reserves the right to (i) credit bid; (ii) set a minimum reserve price; (iii) determine the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced in these Terms of Sale; (iv) reject all bids (including without limitation any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the Sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made); (v) accept a lower bid if the bid is on terms Secured Party determines are more favorable to Secured Party or is from a bidder that, in Secured Party's determination, offers a more certain likelihood of execution; (vi) terminate or adjourn the Sale to another date at any time and from time to time in its sole and absolute discretion, without further publication or notice, and, if it does so, to sell the Collateral at a later public or private sale; (vii) impose any other commercially reasonable conditions upon the sale of the Collateral as the Secured Party may deem proper; (viii) designate a nominee, affiliate, or assignee to take title to the Collateral at closing; and (ix) modify the Terms of Sale. The Secured Party further reserves the right to restrict prospective bidders to those who will represent that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or resale of such Collateral, to verify that each certificate for the Collateral to be sold bears a legend substantially to the effect that such interests have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and may not be disposed of in violation of the provisions of the Securities Act and to impose such other limitations or conditions in connection with the sale of the Collateral as the Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

**PLEASE TAKE FURTHER NOTICE** that all bids (other than credit bids of the Secured Party) must be for cash, with a $2,000,000 deposit due by November 9, 2026, at 3:00 p.m. prevailing Eastern Time, **TIME BEING OF THE ESSENCE,** refundable to unsuccessful bidders within three (3) business days following the conclusion of the auction, then with a deposit increase to 10% (in the aggregate) of the winning bid within two (2) business days after the auction, **TIME BEING OF THE ESSENCE,** and with the full amount due within thirty (30) calendar days after the conclusion of the auction, **TIME BEING OF THE ESSENCE**.

**PLEASE TAKE FURTHER NOTICE** that the full terms and conditions of the sale, copies of the relevant agreements, information for attending the auction, and other information are available through the Data Room and may be obtained by contacting Broker by email to John Howley (john.howley@nmrk.com), John Daniels (john.daniels@nmrk.com). In the event of any conflict between the terms herein and the full Terms of Sale, the full Terms of Sale shall govern.